UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6293-CR-FERGUSON

MAGISTRATE JUDGE SNOW

UNITED STATES OF AMERICA, :

    Plaintiff, :

vs. :

MARION McCLEOD, et al., :

    Defendant. :
_____/



## **MEMORANDUM OF LAW-SELECTIVE PROSECUTION**

The Defendant, Marion McCleod, through undersigned counsel, hereby submits this Memorandum of Law, as requested by the Court, with respect to the issue of selective prosecution, a subject matter that may arise in the form of a motion to dismiss the indictment filed at some point in the future.

On October 5, 2000, a federal grand jury sitting in the Southern District of Florida at Fort Lauderdale, Florida returned an indictment charging eight individuals with one count of conspiracy to possess with intent to distribute in excess of five grams of crack cocaine and twenty individual counts of possession with intent to distribute an unspecified amount of crack cocaine. All eight individuals are charged in the one conspiracy count and the remaining counts charge either a single



defendant or codefendants (but in the case of codefendants never more than two individuals).

On November 1, 2000, six of the defendants made their initial appearance before the Magistrate. Those defendants were Clemente Alexis, Marion McCleod, James Alce, Gary Williams, Damon Walters and Curtis Jones. At the pretrial detention hearing it was established that the total amount of crack cocaine distributed over the five month period of the indictment was 29.3 grams. The transactions were videotaped and reveal the sale to undercover officers of one to two crack cocaine rocks per transaction or count. The total amount of crack cocaine alleged to be distributed by Marion McCleod over the five month period of the indictment was 2.24 grams. Finally, at the detention hearing it was established that the prosecution was brought pursuant to a joint cooperative effort between the Department of Justice and local law enforcement known as the "Weed and Seed".

## Biographical Information

The six defendants who made their initial appearance range from 18 to 22 years of age. One, James Alce, is in his senior year at Dillard High School. The indictment alleges that three of the young men (Clemente Alexis, Damon Walters and Marion McCleod) appearing on November 1, 2000 had a prior conviction for a felony drug offense. All those indicted are African American.

## Statistical Compilation

The defendants are in the process of compiling statistics relative to the issue of selective prosecution. Statistics compiled by the United States Sentencing Guidelines Commission reflect that the race of offenders charged with crack cocaine offenses in the Southern District of Florida for the years 1997, 1998 and 1999 are as follows. In 1997, 82.8% (96) of crack cocaine offenders were African American while 3.4% (4) were white. In 1998, 72.6% (61) of crack cocaine offenders were African American while 4.8% (4) were white. In 1999, 85.9% (122) of crack cocaine offenders were

2

African American while 2.8% (4) were white. Statistics for the year 2000 are not yet available.

The defendants are in the process of gathering statistics from the Clerk's office's in Dade, Broward and Palm Beach Counties which would reflect the number of white persons charged with and convicted of crack distribution offenses (sale, delivery, possession with intent to distribute and trafficking in crack cocaine). The process is laborious and time consuming as the State of Florida does not differentiate by statute between powder and crack cocaine. Therefore, each individual file charging a cocaine distribution offense must be retrieved and read to determine if the case involved crack cocaine. Investigators are presently working in all three Clerk's office's (hopefully later expanding to the other counties comprising the Southern District of Florida) retrieving files from case lists supplied by the State Public Defender office's in all three counties. These figures will obviously reflect only a portion of the total number of crack cases as the lists do not include white persons charged with crack distribution offenses who hired private counsel. None of the investigations are complete. However, as an example of a partial result, in1998 in Broward County alone, there were 52 white persons (represented by the public defender) charged by the Broward State Attorney's Office and convicted for crack distribution offenses. As previously noted, in 1998, four white persons were charged with crack offenses in the entire Southern District of Florida.

## Prosecutorial Discretion

The Attorney General and United States Attorney's retain "broad discretion" to enforce the Nation's criminal laws. United States v. Armstrong, 517 U.S. 456, 464 (1996) quoting United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982)). These individuals possess this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take care that the laws lie faithfully executed." U.S. Const., Art. II, § 3; see, 28

3

U.S.C. §§ 516, 547. Accordingly, "the presumption of regularity supports their prosecutorial decisions and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Armstrong, 517 U.S. at 464, quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926). In the ordinary case, "as long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury generally rests entirely in his discretion." Id. at 464, quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (emphasis added). "Although prosecutorial discretion is broad it is not 'unfettered'. Selectivity in the enforcement of laws . . . is subject to constitutional constraints." Id. at 464 quoting, United States v. Batchelder, 442 U.S. 114, 125 (1979).

On constraint imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, Bolling v. Sharpe, 347 U.S. 497 (1954), is that the decision whether to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary classification." Id. at 464, quoting Oyler v. Boles, 368 U.S. 448, 456 (1962). "A defendant may demonstrate that the administration of a criminal law is 'directed exclusively against a particular class of persons . . . with a mind so unequal and oppressive' that the system of prosecution amounts to a 'practical denial' of equal protection of the law." Id. at 465, quoting Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886).

### Prerequisites for Selective Prosecution Claim

An individual forwarding a claim of Selective Prosecution "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" Id. at 465, quoting Oyler, supra at 456. The requirements for a selective prosecution

4

claim are based upon 'ordinary equal protection standards.'" Id. at 465, quoting Heckler v. Chaney, 470 U.S. 821 (1985). Further, the burden is on the claimant to dispel the presumption that a prosecutor has not violated equal protection by presenting clear evidence to the contrary. Id. at 465; United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000). Practically, and to demonstrate this effect, the claimant must show that similarly situated individuals of a different race were not prosecuted. Id. at 465. "Similarly situated" for selective prosecution purposes, has been defined as "one who engaged in the same type conduct which means that the comparator committed the same basic crime in substantially the same manner as the defendant." United States v. Smith at 810. In the instant matter "similarly situated" individuals to the defendants herein would be those persons who sell or otherwise distribute small individual amounts of crack cocaine in a street level scenario.

### Empirical Data as Proof

Purposeful or intentional or invidious discrimination can be proven by means of statistics. McCleskey v. Kemp, 481 U.S. 279, 293 (1987); United States v. Gordon, 817 F.2d 1538, 1541 (11th Cir. 1987), vacated on other grounds, 836 F.2d 1312 (11th Cir. 1988). In fact, all successful discrimination claims have proven their cases relying solely on empirical data. First, the Supreme Court has accepted statistical disparities as proof of an equal protection violation in the context of the selection of jury venire in a particular district. Id. at 293. Indeed in the area of jury selection, constitutional violations have been proven without an extreme statistical pattern. Id. at 294. Second, statistics have formed the basis of successful constitutional challenges regarding violations of Title VII of the Civil Rights Act of 1964. Id. at 249, citing Bazemore v. Friday, 428 U.S. 385, 400-401 (1986).

In Gomillion v. Lightfoot, 364 U.S. 339, 40 (1960), statistics alone were used to demonstrate a constitutional violation of the Fifteenth Amendment where redistricting excluded 395 of 400 black voters without excluding a single white voter. In Yick Wo v. Hopkins, supra, where an ordinance that prohibited laundries in wooden buildings without permits and all but one white applicant received a permit and none of 200 Chinese applicants were successful, the court found "statistical disparities . . . to warrant and require . . . a conclusion [that was] irresistible, tantamount for all practical purposes to a mathematical demonstration that the state acted with a discriminatory purpose." Id. at 373 (emphasis added).

Similarly, in the context of violations of Title VII of the Civil Rights Act of 1964, Casteneda v. Partida, 430 U.S. 482, 495 (1977) (2 to 1 disparity between Mexican-Americans in county population and those summoned for grand jury duty); Turner v. Fouche, 396 U.S. 346, 359 (1970) (1.6 to 1 disparity between blacks in county population and those on grand jury lists); Whitus v. Georgia, 385 U.S. 545, 552 (1967) (3 to 1 disparity between eligible blacks in county and blacks on grand jury venire) statistics alone have provided sufficient evidence of purposeful discrimination. McCleskey, supra, at 293. The court in McCleskey explained that with the exception of the aforementioned selection of jury venire in a particular district, "the statistical proof normally must present a 'stark' pattern to be accepted as sole proof of discriminatory intent under the constitution." Id. at 293. It is anticipated by the defendants in this case, that when the statistics are finally compiled, they indeed will present a 'stark' pattern and will be tantamount to a mathematical demonstration of purpose.

6

### McCleskey Distinguished

While <u>McCleskey v. Kemp</u>, <u>supra</u>, is informative and provides general guidance, it is of limited application to the facts of the very different matter before the court. Certainly, <u>McCleskey</u>, outlines and supports the aforementioned discussion relative to the proposition that statistics alone can demonstrate discriminatory effect and purpose in a constitutional race claim. One must be careful however to remember that <u>McCleskey</u> was not a selective prosecution case but was a race based constitutional challenge to the application of the death penalty in Georgia, a very different issue from that presented in the instant case. <u>McCleskey</u> does not purport to refine or alter the law applicable to selective prosecution claims in any way. Importantly, <u>Armstrong</u>, the most recent Supreme Court decision regarding selective prosecution makes no mention whatsoever of <u>McCleskey</u>, in the majority opinion written by Chief Justice Rehnquist.

Indeed, <u>McCleskey</u> itself identifies the great distinction between the statistical analysis of a death penalty sentencing decision and those of race based challenges to jury selection and Title VII cases.

In this context, the court writes:

> But the nature of the capital sentencing decision, and the relationship of the statistics to that decision, are fundamentally different from the corresponding elements in the venire-selection or Title VII cases. Most importantly, each particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire. Each jury is unique in its composition, and the Constitution requires that its decision rest on consideration of <u>innumerable</u> factors that <u>vary</u> according to the characteristics of the individual defendant and the facts of the particular capital offense. See <u>Hitchcock v. Dugger</u>, 481 U.S. 393, 398-399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347; <u>Lockett v. Ohio</u>, 438 U.S. 586, 602-605, 98 S.Ct. 2954, 2963-65, L.Ed.2d 973 (1978) (plurality opinion of Burger, C.J.). Thus, the application of an inference drawn from the general statistics to a

7

> specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire selection or Title VII case. In those cases, the statistics relate to <u>fewer entities</u>, and <u>fewer variables</u> are relevant to the challenged decisions. <u>Id</u>. at 294-295. (Emphasis added.)

Importantly, the decision in the instant matter (to present the case for indictment) stands in stark contrast to the decision arrived at in imposing a sentence of death and is much more akin to the decisions rendered in jury venire and Title VII cases. Indeed, as <u>McCleskey</u> delineates, the death penalty decision is imposed after consideration of <u>innumerable</u> factors. The court explained that a capital sentencing jury may consider any factor relevant to the defendant's background, character and the offense. <u>Id</u>. at 295, n.14. In fact, as the court noted, "McCleskey's claim of discrimination extends to every actor in the Georgia capital sentencing process, from the prosecutor who sought the death penalty and the jury that imposed the sentence, to the state itself that enacted the capital punishment statute and allows it to remain in effect despite its allegedly discriminatory application." <u>Id</u>. at 292. Ultimately, <u>McCleskey</u> could not identify the actor responsible for the disparate impact and consequently could not raise an inference that any decision maker had acted with invidious intent.

This multitude of actors and innumerable and varying number of decisional factors presented an insurmountable hurdle for <u>McCleskey</u> to overcome. Quite to the contrary, the decision in the case at hand (to indict or not) is a simple one. The factors to be considered in making the decision are limited. Further, the decision makers consist of three people, Attorney General Janet Reno, former United States Attorney for the Southern District of Florida Thomas Scott and present United States Attorney for the Southern District of Florida Guy Lewis. The reasons and factors motivating the prosecution in the instant matter can be readily ascertained.

8

Another consideration, explained in McCleskey, that distinguishes this case from the capital sentencing decision, is the need for the decision maker to have an opportunity to explain the statistical disparity. Id. at 295. See also, Whitus v. Georgia, 385 U.S. at 552; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). McCleskey noted that public policy prohibits jurors from testifying regarding the motives and influences that led to their verdict. Id. at 296. No such impediment exists in the case at bar.

In this context, McCleskey spoke to the issue of a prosecutor having to defend his decision to seek the death penalty. This inquiry was frowned upon in McCleskey as this would require prosecutors to defend their decisions "often years after they were made." Id. at 296. Again, this concern is non-existent in the present case.

Moreover, McCleskey distinguishes between "requiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors . . . from requiring a prosecutor to rebut a contemporaneous challenge to his own acts." Id. at 297, n.17, citing Batson v. Kentucky, 476 U.S. 79 (1986). Factually, it must be remembered that McCleskey challenged the capital filing decision of every prosecutor in every city and county throughout the State of Georgia over a ten year time period. Clearly, it would be impossible for all those actors to meaningfully rebut McCleskey's statistics. Here, there is no such problem. The two United States Attorneys for the Southern District of Florida for the applicable time period (1998-2000) Mr. Scott and Mr. Lewis will have a simple, fair and reasonable opportunity to attempt to rebut or explain the statistics compiled.

9

In sum, the scenario in McCleod is not at all like that existing in McCleskey, in fact, it is much more analogous to Batson, supra, where the prosecutor is required, once an initial showing is made, to rebut a contemporaneous challenge to his own acts.

Prerequisite for Entitlement to Evidentiary Hearing and Discovery

The standard applicable in this Circuit for obtaining an evidentiary hearing on a selective prosecution claim is less onerous than required to prevail upon that claim. In order to obtain a hearing defendants must allege "sufficient evidence to establish a 'colorable entitlement' for a selective prosecution claim." Gordon, 817 F.2d at 1540. Defendants have done so when they set forth "sufficient facts 'to take the question past the frivolous state and raise a reasonable doubt as to the prosecutor's purpose.'" Id. quoting United States v. Hazel, 696 F.2d 474, 475 (6th Cir. 1983) and United States v. Larson, 612 F.2d 1301, 1304-05 (8th Cir.) cert. denied, 446 U.S. 936 (1980).

The same standard, that of a nonfrivolous claim, governs discovery. Gordon, 817 F.2d at 1540. See also, United States v. Adams, 870 F.2d 1140, 1146 (6th Cir. 1989) (defendant must present "some evidence tending to show the existence of the essential elements of the defense"). Accord Armstrong, 517 U.S. at 468 (1996); United States v. Heidecke, 900 F.2d 1155, 1158 (1990). This standard presents a low hurdle for defendants seeking discovery on a claim of selective prosecution because "most of the relevant proof in selective prosecution cases will normally be in the Government's hands." Heidecke, 900 F.2d at 1158.

## Conclusion

From the foregoing discussion Mr. McCleod suggests the following procedure be invoked once the actual motion to dismiss is filed, assuming that the defendant meets the aforementioned burdens. The court would order the government to respond to the motion giving the government the

10

opportunity to rebut the defendant's claims. The court would order discovery relative to the selective prosecution issues. An evidentiary hearing would follow wherein both sides would have an opportunity to present evidence (documentary, testimonial or otherwise) in support of their claims. This procedure is consistent with all the aforementioned precedent and will allow both sides a fair and reasonable opportunity to be heard on this very important issue.

WHEREFORE, the defendant respectfully submits this memorandum of law as requested.

Respectfully submitted,

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____
Timothy M. Day
Assistant Federal Public Defender
Florida Bar No. 360325
101 N.E. 3rd Avenue
Suite 202
Fort Lauderdale, Florida 33301
(954) 356-7436
(954) 356-7556 (fax)

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed on this ___9___ day of March, 2001 to Bruce Brown, Esquire, United States Attorney's Office, 299 E. Broward Blvd., Fort Lauderdale, Florida 33301; Michael G. Smith, Esquire, 633 S.E. 3rd Avenue, Suite 4F, Fort Lauderdale, Florida 33301-3151; Howard L. Greitzer, Esquire, 600 N.E. 3rd Avenue, Fort Lauderdale, Florida 33304; David P. Hodge, Esquire, 727 N.E. 3rd Avenue, Fort Lauderdale, Florida 33304-2646; David J. Joffe, Esquire, 2900 Bridgeport Avenue, Suite 401, Miami, Florida 33133-3606; Richard F. Della Fera, Esquire, 200 E. Broward Blvd., Suite 1210, Fort Lauderdale, Florida 33301-1933; Leo Spitale, Esquire, 3191 Coral Way, Suite 619, Miami, Florida 33145.

_____
Timothy M. Day

S:\DAY\McCleod\Law-Selective.01.wpd

12